IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MATT BRODY, on behalf of himself and all others similarly situated, | § § § | |
| Plaintiff, | § § | |
| VS. | § § § | CIVIL ACTION NO. 3:04-CV-1931-K |
| ZIX CORPORATION, et al. | § § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants Zix Corporation, Ronald A. Woessner, John A. Ryan, Daniel S. Nutkis, Steve M. York, and Dennis F. Heathcotes' (collectively "Defendants") Motion to Dismiss. For the following reasons, the Court **DENIES** the motion.

## I. FACTUAL BACKGROUND

Lead Plaintiff Matt Brody ("Plaintiff") in this case represents a class of individuals who purchased Zix Corporation's ("Zix") stock on or between October 30, 2003 and May 4, 2004 ("Class Period"). Zix is a provider of e-messaging protection and transaction services. The Named Defendants in this case are Zix and its executives for the Class Period: John A. Ryan ("Ryan"), CEO; Daniel S. Nutkis ("Nutkis"), Executive Vice President and Chief Strategy Officer; Steve M. York ("York"), Chief Financial Officer; Ronald A. Woessner ("Woessner"), Senior Vice President and General Counsel;

1

and Dennis F. Heathcote ("Heathcote"), Vice President of Sales and Marketing.

In July 2003, Zix acquired substantially all of the assets and business of PocketScript, LLC ("PocketScript"), which developed electronic prescription solutions for physicians and healthcare professionals. PocketScript's electronic prescription devices gave physicians the ability to write prescriptions electronically and then transmit those prescriptions to pharmacies. This program was intended to alleviate problems with illegible physician handwriting on prescriptions and help doctors streamline the process of dealing with insurance companies and pharmacies.

Plaintiff alleges that on October 30, 2003, Defendant Ryan, with Defendants York and Nutkis present, conducted a conference call with industry analysts to discuss Zix's prospects and those of its new PocketScript product line. In that conference call, Ryan stated that Zix's goal was to equip 1,000 physicians with PocketScript devices by the end of 2003, equip 1,000 physicians per month in early 2004, and equip 2000 physicians per month "later that year." He also stated that Zix had "deployed over 500 physicians to date," meaning a PocketScript system had been installed in over 500 physicians' offices and the physicians and/or physician assistants had received training.

Likewise, Plaintiff alleges that on February 3, 2004, Zix issued a press release and conducted another conference call with analysts to discuss its Fourth Quarter 2003 results and discuss company projections for the coming year. In that conference call, Ryan reiterated that Zix's PocketScript line had been progressing well, and gave high

2

goals for the coming year.

Based on these high projections and other assurances from Defendants, the price of Zix stock rose dramatically during this time from roughly $9 per share on October 30, 2003, to over $17 per share on April 12, 2004.  During this time, several of the Defendants acted on these high stock prices and sold large portions of their stock–Woessner sold 85.7% of his stock during this time for proceeds of $1,518,576.44; Nutkis sold 80.8% of his stock for proceeds of $1,102,302.45; and York sold 86.2% of his stock for $1,490,544.99.

However, Plaintiff alleges that while expectations had been high for PocketScript, Zix ran into major problems with the device's software and marketing.  On May 4, 2004, Ryan revealed in a conference call to industry analysts that things were not going as well as they had hoped. Plaintiff alleges that based on this news, the price of Zix stock fell 50% over the next few days.

Plaintiff now alleges that: 1) Defendants knew about the technical problems, complaints by physicians over the usability of the product, and the widespread difficulties Zix had in actually deploying PocketScript devices; 2) Defendants made material misleading statements concerning the number of devices actually deployed; and 3) Defendants misled analysts and investors in their public statements by continuing to overstate goals and projections when in fact the PocketScript product line's actual numbers were not even close to those projections.  Plaintiff claims that because of these

3

misrepresentations, the price of Zix stock was artificially inflated, and that the class members sustained severe losses when the truth came out about the company's actual status.

## II. LEGAL STANDARD

In reviewing a Rule 12(b)(6) motion, which tests the legal sufficiency of the claims stated in the complaint, a court must look solely at the pleadings themselves. *Jackson v. Procunier*, 789 F.2d 307, 309-10 (5th Cir. 1986). In looking at whether the complaint states a valid claim upon which relief can be granted, the court must view all facts in a light most favorable to the plaintiff and resolve any doubts in favor of the plaintiff. *Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997). The court must assume the truth of all pleaded facts and liberally construe the complaint in favor of the plaintiff. *Oliver v. Scott*, 276 F.3d 736, 740 (5th Cir. 2002). To survive a 12(b)(6) motion, a plaintiff must not make mere conclusory allegations, but must instead plead specific facts. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992). Dismissal is appropriate where the plaintiff merely makes conclusory allegations or unwarranted deductions of fact. *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 379 (5th Cir. 2003). Likewise, dismissal is appropriate where the plaintiff makes no allegations regarding a required element of the asserted claim. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995). However, in the context of securities fraud, a dismissal pursuant to Rule 12(b)(6) is difficult to obtain since such a claim revolves

around fact-specific inquiries. *See Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988).

Section 10(b) of the Securities Exchange Act of 1934 forbids the "use or employ, in connection with the purchase or sale of any security...[of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe. . . ." 15 U.S.C. § 78j(b).  Rule 10b-5, promulgated pursuant to section 10(b), forbids the use of any "device, scheme, or artifice to defraud," and makes it unlawful for an individual to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).  Plaintiffs claiming a violation of 10(b) must plead, in connection with the purchase or sale of any security: "(1) a misrepresentation or omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiff's] injury. *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 406-07 (5th Cir. 2001); *see Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-342 (2005).

Because Plaintiff asserts securities fraud under Section 10(b) and Rule 10b-5, he must also satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Rule 9(b) requires a plaintiff alleging fraud to plead with particularity the circumstances constituting fraud, including specific allegations of the time, place, and content of the misrepresentations, the identity of the individuals who made the misrepresentations, and

5

what the person who made those misrepresentations gained from the making of those statements. *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir. 1993). In addition, the PSLRA requires complaints alleging securities fraud to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1) (1998). For particularity purposes, a plaintiff must specify the who, what, when, where, and how of their alleged securities fraud. *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 349-50 (5th Cir. 2002).

## III. SUFFICIENCY OF PLAINTIFF'S PLEADING

### A.    Section 10(b) Claims

Plaintiffs claiming a violation of 10(b) must plead, in connection with the purchase or sale of any security: "(1) a misrepresentation or omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiff's] injury. *Nathenson*, 267 F.3d at 406-07.

#### 1.    Material Misrepresentation

In order to show that a defendant's statement or omission was "material," the plaintiff must show that the omitted or misrepresented information would have been significant to a reasonable investor in making their investing decisions. *Basic*, 485 U.S. at 232 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

Materiality depends on the interplay between the magnitude of the information and the probability that the event will occur. *Basic*, 485 U.S. at 238. Broad, generalized statements considered "puffery" are not actionable under Section 10(b) and Rule 10b-5. *See Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 698 (5th Cir. 2005). Statements which are "mere puffery" are "vague and optimistic" containing "no concrete factual or material misrepresentation." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (quoting *Lain v. Evans*, 123 F.Supp.2d 344, 348 (N.D. Tex. 2000)(Sanders, J.))

Plaintiff alleges misrepresentations and omissions were made through various statements, both oral and written, made by Defendants in press releases and/or in conference calls with analysts as follows:

(1) the healthcare industry acknowledged the effectiveness and benefits of e-prescribing;

(2) the goal for the end of 2003 was to deploy 1,000 physicians, then to deploy at least 1,000 physicians a month in early 2004 with 2,000 a month later in 2004;

(3) 500 physicians were already deployed as of October 30, 2003, and over 65,000 transactions had been processed during August and September 2003;

(4) anticipated customer commitments for the 4th Quarter 2003 was $2.25 million to $2.5 million, the low end being "virtually completed;"

(5) the participation of the 500 deployed physicians was an indication of the continued acceptance of e-prescribing;

(6) major healthcare product line (i.e., PocketScript) showed continued

growth and strength as seen in Fourth Quarter 2003;

(7) by December 2003, 600 active physicians had been deployed, with an additional 400 physicians using the device occasionally;

(8) goal of 10,000 deployed physicians by end of 2004 was "achievable" because 4,000 pre-paid physicians were on order by February 3, 2004;

(9) 4,000 to 5,000 physicians made a base for the e-labs results service "Dr. Chart;"

(10) orders for the First Quarter 2004 were expected to be 11.5 million to 13 million, an increase of 4.2 million to 5.7 million over Fourth Quarter 2003, which includes a 4 million Adventist award Zix was already paid for;

(11) revenue for First Quarter 2004 was expected to be $2.8 million to $3 million, an almost 50% increase over Fourth Quarter 2003; and

(12) PocketScript's performance was better than expected after Zix completed the first full quarter of operations after acquiring PocketScript and another software product, both of which contributed to 7.3 million in new orders.

In this case, Plaintiff has sufficiently plead that Defendants allegedly made materially misleading statements and omissions. Plaintiff has effectively plead the "who, what, when, where and how" of securities fraud as to the Defendants. *See Shushany*, 992 F.2d at 521. Plaintiff has identified:

(1) the meetings at which the alleged omissions and/or materially misleading statements were made;

(2) the persons present at the meetings;

(3) who made the statements; and

(4) the allegedly misleading information and/or omissions which were provided to analysts and investors.

Such statements as Plaintiff has plead cannot be considered "mere puffery" as they are more than vague or optimistic; they contain concrete factual information Defendants could be found to have misrepresented.

Plaintiff has likewise plead why these statements were false by providing confidential witnesses who claim that:

> (1) only 100 devices had been deployed by the October 2003 meeting, rather than the 500 Ryan stated had been deployed, and only 60 practice groups had actually installed the device, with actual usage being 20-25% of those physicians;
>
> (2) only 230 physicians had been deployed as of the First Quarter 2004, as opposed to the 600 claimed by Ryan; and
>
> (3) physicians had complained of many technical and software problems with the devices, including the lack of "technical literacy" and support staff, inadequate formularies to allow physicians to properly prescribe medications, and lack of pharmacy contact information.

The Court concludes that Plaintiff's confidential sources have been pleaded with enough particularity to "'support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief.'" *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 259 (5th Cir. 2005) (quoting *ABC Arbitrage*, 291 F.3d at 353). Plaintiff specifies each confidential witness's job title, job description, time-frame employed at Zix, and specifically what the witness knew in relation to the PocketScript, its performance, and the Defendants.

Furthermore, Plaintiff pleaded that Defendants knew, or were reckless in not

9

knowing, of the problems which plagued the PocketScript at the time the alleged misrepresentations were being made. Plaintiff's complaint specifically alleges, based on confidential witnesses, that Defendants had knowledge of the various problems with PocketScript, the actual deployment numbers, and the actual usage. Furthermore, there are specific allegations that Defendants had access to internal information of Zix related to PocketScript's true performance. Plaintiff contends Defendants knew of three internal tracking systems, "Big Foot," "Heat," and a sales tracking system. Based on confidential sources, each of the three systems, which tracked scheduled deployment, actual deployment, and sales of the systems, were regularly updated, and indicated that no more than 100 units had been deployed as of July 2004. Plaintiff contends that in spite of knowing all this information, Defendants continued to issue information to the public about the positive performance of PocketScript.

Plaintiff has shown that these statements made by Defendants are material in that the allegedly misrepresented information would have been important to a reasonable investor in making their investment decision. *See Basic*, 485 U.S. at 232. The Court cannot conclude these statements amounted merely to "puffery" as they could be found to contain material misrepresentations and there is nothing vague or merely optimistic about them. *See Plotkin*, 407 F.3d at 698; *Southland*, 365 F.3d at 361.

    a)    Safe Harbor under PSLRA

The PSLRA does provide a safe harbor for both written and oral forward-looking

statements if, and to the extent that, the statement is "identified as a forward looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward looking statement. . . [and was not] made with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. § 77z-2(c)(1)(A)-(B).  To avoid the safe harbor provision, the plaintiff must pleaded facts evidencing the statement was made with actual knowledge of its falsity.  *Southland*, 365 F.3d at 371.  As discussed in the Material Misrepresentation section, the Court concludes Plaintiff has sufficiently plead evidence that Defendants knew the statements they made were false.  Therefore, Plaintiff has successfully avoided the PSLRA safe harbor provision.  *See id.*

    2.    <u>Scienter</u>

In the context of securities fraud, the Fifth Circuit has defined scienter as being an "intent to deceive, manipulate, or defraud" or the type of "severe recklessness" which poses a "danger of misleading buyers or sellers. . . [and] is either known to the defendant or is so obvious that the defendant must have been aware of it." *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 1981).  To allege scienter based on conscious behavior, or intent, a plaintiff must plead sufficient circumstantial evidence of misbehavior.  *Mortensen v. AmeriCredit Corp.*, 123 F.Supp.2d 1018, 1025 (N.D. Tex. 2000)(Fitzwater, J.).  Severe recklessness encompasses "highly unreasonable omissions or misrepresentations," not simply of inexcusable or simple negligence, but of "an

11

extreme departure from the standards of ordinary care," and which poses a risk of misleading buyers and/or sellers, which either the defendant knows or it is so obvious that the defendant must have been aware of it. *Fener v. Belo Corp.*, 425 F.Supp.2d 788, 795 (N.D. Tex. 2006)(Fitzwater, J.)(citing *Nathenson*, 267 F.3d at 408). Allegations of motive and opportunity may strengthen the suggestion of scienter. *Nathenson*, 267 F.3d at 412. The court considers the plaintiff's evidence of scienter cumulatively. *Goldstein v. MCI WorldCom*, 340 F.3d 238, 237 (5th Cir. 2003).

In the present case, Plaintiff plead scienter as to the Defendants alleging they were severely reckless, at a minimum, based on their motive to commit fraud, evidenced by stock sales at suspicious times and in suspicious amounts, and also based on their alleged knowledge, or recklessness in not knowing, of the actual problems with PocketScript because of their access to information within Zix.

        a)       Stock Sales

Evidence of insider trading alone is not enough to show scienter as to a defendant, but when insider trading is done in suspicious amounts and at suspicious times, such facts evidence a strong inference of scienter. *Southland*, 365 F.3d at 368. If a plaintiff can show that several defendants made suspicious sales at suspicious times, and profited greatly thereby, such facts are probative of the defendants' intent to inflate the price of their company's stock in order to make a personal profit from their insider sales. *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 434-435 (5th Cir. 2002); *see Southland*, 365 F.3d at

368 (where the company's CEO sold 40 percent of his company stock at prices which were inflated by his own material misrepresentations as to company revenues, such facts raised a strong inference of scienter on his part).

Here, Plaintiff has plead that, during the Class Period after the alleged misrepresentations were made, Defendants Woessner, Nutkis, and York, three of the five named individual Defendants, exercised their stock options and that same day, sold over 80% of their personal stock holdings totaling more than $4.6 million.  Plaintiff alleges that this was done at times when the price of the Zix stock was allegedly inflated due to the material misrepresentations of the Defendants:

>Woessner sold 85.7% of his holdings for proceeds of $1,518,576.44;

>Nutkis sold 80.8% of his holdings for proceeds of $1,102,302.45; and

>York sold 86.2% of his holdings for proceeds of $1,490,544.99.

Plaintiff also plead that none of these Defendants had sold stock prior to the Class Period.  The Court concludes such allegations as these which Plaintiff has plead give rise to a strong inference of scienter on the part of the Defendants.  *See Abrams*, 292 F.3d at 435; *see also Nathenson*, 267 F.3d at 412 (allegations of motive and opportunity strengthen inference of scienter).

   b)  Knowledge of PocketScript's Problems

Scienter cannot be proved by inferring a corporate defendant must have known of the misstatement or omission simply because of his position in the company.  *Abrams*,

292 F.3d at 432; *In re Odyssey Healthcare, Inc. Securities Litigation*, 424 F.Supp.2d 880, 890 (N.D. Tex. 2005)(Godbey, J.). However, where a plaintiff can show that defendants received and had actual knowledge to show that their statements to investors were materially misleading, such as information from computer tracking reports, such facts would give rise to a strong inference of scienter. *See In Re Odyssey Healthcare*, 424 F.Supp.2d at 889-90. Here, Plaintiff has plead, based on the testimony of confidential witnesses, that Defendants regularly received computer tracking reports from internal reporting systems which would have alerted them to the fact that their statements to analysts about physician deployment numbers were materially misleading. As the Court discussed *supra* in Material Misrepresentation, Plaintiff specifies each of the three tracking systems which were used, naming the systems and what each tracked, and what the confidential sources allege Defendants knew based on these reports. Plaintiff plead sufficient evidence that Defendants had actual knowledge to indicate their alleged misstatements and omissions could be materially misleading, thereby allowing the Court to infer scienter.

Considering all of Plaintiff's evidence cumulatively, the Court concludes Plaintiff has sufficiently plead scienter.

3.    Reliance

The third element Plaintiff must plead is reliance by the investors on the statements made by Defendants. *Dura*, 544 U.S. at 342. In class action suits involving

14

securities fraud, the Supreme Court has noted that plaintiffs may use the "fraud on the market" theory to prove reliance. *Basic*, 485 U.S. at 241; *see Nathenson*, 267 F.3d at 413-14. The Supreme Court

> "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements . . . ."

*Basic*, 485 U.S. at 241. When material misrepresentations have been made publicly or omissions have made the market information misleading, the stock price is not accurate and investors may be defrauded. *In re Azurix Corp. Sec. Litigation*, 198 F.Supp.2d 862, 880 (S.D. Tex. 2002). If the plaintiff can show that material misrepresentations were placed into the market or omissions made the market information misleading, the plaintiff is entitled to a presumption of reliance. *Id.* Plaintiff must present evidence that the stock price was affected by the misrepresentation or omission. *See Nathenson*, 267 F.3d at 414. In providing this evidence, Plaintiff may rely on the "fraud on the market" theory to establish reliance by the investors. *See Basic*, 485 U.S. at 241; *Id.*

The Court notes at the outset that Defendants make no argument in their motion to dismiss related to Plaintiff's failure to sufficiently establish reliance in the Complaint. However, the Court will still address this necessary element. In the Complaint, Plaintiff contends Defendants made allegedly material misrepresentations and/or omissions, as discussed in detail *supra* in the Material Misrepresentations section, in press statements

15

and in conference calls with analysts. During the Class Period, in which these statements were made, the price of Zix stock rose from $9 a share at the beginning of the Period to over $17 a share on April 24, 2004, ten days before the end of the Period. Plaintiff presented evidence that the price of Zix stock fell 50% in the days following the May 4 press release, May 4 conference call, and May 5 press release which revealed that the performance was not as anticipated. The Court concludes Plaintiff has sufficiently shown that allegedly material misrepresentations were placed into the mix of market information as discussed *supra*; therefore, Plaintiff is entitled to a rebuttable presumption of reliance. *See Azurix,* 198 F.Supp.2d at 880.

    4.    Loss Causation

In order to prove loss causation, a plaintiff must show "a casual connection between the material misrepresentation and the loss." *Dura*, 544 U.S. at 342. Showing an inflated stock purchase price alone cannot in and of itself evidence loss causation; the misrepresentation which caused the inflated purchase price must have caused an economic loss, not just the potential for one. *Id.* at 345; *see also United States v. Olis*, 429 F.3d 540, 546 (5th Cir. 2005) (no loss may be attributable to a misrepresentation until the truth is later revealed and the price of the stock subsequently drops). Furthermore, the Supreme Court concluded that, pursuant to Federal Rule of Civil Procedure 8(a)(2),the plaintiff must provide the defendant with some notice of the loss and the connection plaintiff sees. *Id.* at 347.

16

Applying the *Dura* standard to this case, the Court concludes Plaintiff has adequately plead loss causation. Plaintiff sufficiently plead, as discussed *supra*, the misrepresentations Defendants made in relation to the PocketScript. Plaintiff plead that, during the Class Period, the purchase price of Zix stock rose from $9 per share to over $17 per share while the Defendants continued to make their alleged misrepresentations in press statements and conference calls with analysts, thereby, according to Plaintiff, causing the stock price to be become inflated. Plaintiff further plead that Defendants' disclosures on May 4, 2004, the last day of the class period, as well as on May 5, of the true performance of the PocketScript and its deployment, caused the price of Zix stock to fall dramatically, 50% over the following days. There can be no doubt that this provides Defendants with at least some notice of the loss and the connection Plaintiff sees to the Defendants' alleged misrepresentations and then subsequent revelation of the truth, at least partially, thereby complying with *Dura*. The Court concludes that Plaintiff has sufficiently plead loss causation. *See Dura*, 544 U.S. at 342-47.

**B.  Section 20(a) Claim**

Section 20(a) of the Securities and Exchange Act holds liable any individual who is a "controlling person" over another individual who commits securities fraud. 15 U.S.C. § 77t(a). The Court must look to whether Plaintiff has sufficiently plead facts establishing that the Defendants were in control of Zix, the primary violator. *See*

*Kunzweiler v. Zero.Net, Inc.*, 3:00-CV-2553-P, 2002 WL 1461732, at *13 (N.D. Tex. 2002)(Solis, J.). A prima facie case of Section 20(a) claims are subject to the pleading requirements of Federal Rule of Civil Procedure 8, not the heightened requirements of Rule 9(b); therefore, only a statement giving the defendant fair notice of the plaintiff's claim and the basis of the allegation is required. *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 620 (5th Cir. 1993).

Plaintiff's Complaint alleges the following Section 20(a) violation:

> The Defendants . . . acted as controlling persons of Zix within the meaning of Section 20(a) . . . . By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the [Zix's] operations and/or intimate knowledge of the false financial statements filed by [Zix] with the SEC and disseminated to the investing public, Defendants . . . had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading. Defendants . . . were provided with or had unlimited access to copies of [Zix's] reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.
> In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of [Zix] and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.
> By virtue of their positions as controlling persons, Defendants . . . are liable pursuant to Section 20(a) . . . jointly and severally with Zix for Zix's violation of Section 10(b) and Rule 10b-5. As a direct and proximate result of

> Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of [Zix's] securities during Class Period.

Plaintiff alleges that all the Defendants, by virtue of their positions within Zix, had sufficient control over the information which was disseminated to the public and given to the SEC. In addition, because of their participation in Zix's operations as well as their access to certain internal information, all the Defendants knew of the falsity of the information being given and could have stopped the dissemination of false information. Plaintiff has sufficiently stated control status under Section 20(a) as to all the Defendants. Furthermore, Plaintiff's complaint regarding the Defendants' violations of Section 20(a) provides sufficient notice under Rule 8. *See id.*

## IV.  CONCLUSION

The court finds that Plaintiff's complaint sufficiently alleges a Section 10(b) fraud claim against Defendants with the requisite particularity. Plaintiff's complaint also sufficiently alleges a Section 20(a) claim against Defendants with the requisite notice. Therefore, the Defendants' Motion to Dismiss is **DENIED**.

SO ORDERED

Signed September 26th, 2006

*Ed Kinkeade*
ED KINKEADE
UNITED STATES DISTRICT JUDGE

19